JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
HEATHER S. PATRICCO, DISTRICT OF COLUMBIA BAR NO. 465883
ASSISTANT UNITED STATES ATTORNEY
ERIN C. BLACKADAR, IDAHO STATE BAR NO. 8996
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>    vs.<br>RANDY SCOTT VAIL,<br><br>        Defendant. | Case No. 1:23-cr-00217-BLW<br><br>**UNITED STATES OF AMERICA'S<br>SENTENCING MEMORANDUM** |

The Defendant comes before the Court having pled guilty to the charge of Destruction of
an Energy Facility in violation of 18 U.S.C. § 1366(a).  The Government recommends that the
Court sentence the Defendant to a term of imprisonment of 33 months, to be followed by three
years of supervised release.  The Government also requests that the Court order the Defendant to
pay $680,884.96 in restitution and forfeit the property listed in the Preliminary Order of Forfeiture.

**BACKGROUND**

On August 8, 2023, a Boise grand jury returned an Indictment charging Defendant with
two counts of Destruction of an Energy Facility in violation of 18 U.S.C. § 1366(a), for knowingly
and willfully using firearms to damage the hydroelectric power stations at the Hells Canyon and

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 1**

Brownlee Dams located along the Idaho-Oregon border on June 8 and 9, 2023.  (ECF 1).[1]   On

February 20, 2024, Defendant entered into a plea agreement with the Government.  (ECF 40).  On

March 7, 2024, the Defendant pled guilty to Count One of the Indictment.  (ECF 45).  As part of

the plea agreement, the Government agreed to dismiss Count Two of the Indictment.  (ECF 40).

The Defendant agreed to admit the forfeiture allegation as set forth in the Indictment, as well as to

remit *at least* $546,982.46 in restitution to the victim, Idaho Power Company.  *Id.*  In addition, the

Government notified the Defendant in the plea agreement that at sentencing the Government would

request an additional $133,902.50 in restitution for post-incident security costs incurred by Idaho

Power Company.  *Id.* at 5-6.

## APPLICABLE SENTENCING GUIDELINES RANGE

On April 22, 2024, the initial Presentence Investigation Report (PSIR) was issued.  (ECF

49).  On May 21, 2024, the final PSIR was issued.  (ECF 50).  The statutory maximum term of

imprisonment is 20 years.  *Id.* at ¶55.  The PSIR calculates Defendant's Offense Level as 18 with

a Criminal History Category of I for a United States Sentencing Guideline Range (USSG) of 27 to

33 months imprisonment.  *Id.* at ¶56.  The Government has no objection to the USSG range as set

forth in the PSIR.

## SENTENCING ANALYSIS UNDER 18 U.S.C. § 3553

The Defendant committed violent and dangerous attacks on critical infrastructure using

firearms.  On June 8, 2023, and continuing into June 9, 2023, Defendant attacked the Hells Canyon

---

[1] On June 9, 2023, Defendant was charged by Washington County, Idaho (where Brownlee Dam is located on the border with Oregon) with two felony counts, Officer-Flee or Attempt to Elude a Police Officer in a Motor Vehicle and Destructive Devices or Bombs-Possess Design Which Propels Shrapnel.  Also on June 9, 2023, Adams County, Idaho (where Hells Canyon Dam is located on the border with Oregon) charged Defendant with one felony count of Malicious Injury to Property.  Those charges were ultimately dismissed, and the instant federal prosecution was brought.

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 2**

Dam hydroelectric power station and the Brownlee Dam hydroelectric power station causing power loss and substantial damage to both. The Dams produce, transmit, store, and distribute electricity to Washington, Idaho, and Oregon and represent the largest generators of electricity in Idaho Power's service territory.

The attacks were premeditated. Defendant committed the attacks to make a political statement against a government he considers illegitimate. Defendant bought materials, researched dams exploding in Ukraine, and conducted his attacks in the middle of the night to ensure success and minimize risk of detection by law enforcement. In Defendant's own words to his family, "I did what I did for a reason." Considering the sentencing analysis under 18 U.S.C. § 3553 as set forth below, 33 months' imprisonment is not only appropriate, but necessary to ensure just punishment and deter others that would commit attacks on critical infrastructure in Idaho and elsewhere.

A.    **The Nature and Circumstances of the Offense**

1.    **Background**

On June 8, 2023, law enforcement was contacted after an individual observed a subject on a motorcycle with a guitar case strapped to his back shooting from the top of Hells Canyon Dam at the dam's power substations. Alarms were set off at the dam and the power to the surveillance video went dark. Idaho Power surveillance footage shows a subject dressed in dark clothing and a bag on his back consistent with a guitar case arriving on the top of the Hells Canyon Dam via motorcycle at approximately 10:52 p.m. The subject parked the motorcycle and walked to the north side of the Dam in front of a chain link fence that overlooks the dam's power substations. The subject loaded the rifle with ammunition and shot at the substations. Power loss at Hells Canyon Dam was reported two minutes later at approximately 10:54 p.m. Idaho Power employees located at the Dam were instructed to shelter-in-place after the attack.

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 3**

Shortly thereafter, additional Idaho Power employees arrived at the dam to investigate the power loss and passed a motorcycle leaving the area.  While at the Hells Canyon Dam, the employees located a box of British .303 caliber ammunition sitting on the north side of the Dam on a curb in front of a chain link fence that overlooks the dam's power substations.  Surveillance video revealed that the box of ammunition was found in the same location where the subject was shooting at the power substations.



Approximately one hour later, on June 9, 2023, at 12:00 a.m., surveillance footage from the Brownlee Dam showed a subject on a motorcycle driving near Brownlee Dam.  At approximately 12:06 a.m. surveillance footage from the Brownlee Dam showed a large plume of sparks in the switch yard of the power plant.  Travel time between Hells Canyon Dam and Brownlee Dam is approximately one hour.

At approximately 12:43 a.m.,  a Washington County, Idaho Sheriff's Deputy observed a motorcycle on Highway 71 traveling south towards Cambridge, Idaho.  This route is consistent

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 4**

with a person traveling away from Brownlee Dam.  The deputy advised dispatch and other law enforcement in the area that he had not activated emergency lights and sirens and wanted to follow the motorcycle until getting closer to town.  The deputy followed the motorcycle and advised that the motorcycle was traveling at speeds of approximately 80 miles per hour (MPH)  in a 25 MPH zone.  The deputy initiated emergency lights and sirens, but the motorcycle failed to yield and increased speeds to over 105 MPH with the motorcycle still pulling away.  After approximately three miles, the motorcycle yielded to lights and sirens, and deputies drew their weapons and instructed the individual to get on the ground, and he was taken into custody.  After removing his motorcycle helmet - the individual was identified as Randy Vail.  During a search and inventory of Defendant and the motorcycle, law enforcement located bolt cutters, a guitar case housing two rifles, a black rifle with a purple sling chambered for .303 caliber ammunition, a Strum Ruger & Co. Mini-14 with a wood stock, three magazines with .223 caliber ammunition, .303 and .223 spent casings as well as live ammunition.  Defendant also was carrying two yellow compressed air tanks with gasoline with the pressure gauge missing.



### 2.   The Dams Provide Critical Power to Millions of People

There are three hydroelectric dams on the border of Idaho and Oregon that make up the Hells Canyon Complex owned and operated by Idaho Power.  This includes Hells Canyon Dam, Brownlee Dam, and Oxbow Dam.  Together these three dams account for approximately 70% of Idaho Power's hydro generation and approximately 30% of the total energy generated.[2]  These hydroelectric dams are critical infrastructure that produce, transmit, store, and distribute electricity to Idaho, Oregon, and surrounding states.

As a result of the Defendant's attack on the dams, Idaho Power lost substantial power that generated from the Hells Canyon dam alone – approximately ten percent of its generation.  The equipment damaged by the Defendant's actions on the early morning hours of June 8 and 9, 2023 was not salvageable.  Idaho Power was forced to replace all the equipment at both dams.  This required large transport trucks, cranes, as well as closing public areas for recreational fishing and boating while the repairs were being made at the dams.  Typically, damaged equipment such as the type at issue here – can take anywhere up to two years to acquire parts because of supply chain issues.  Idaho Power must now replace the spare parts it used due to the Defendant's attacks -- should equipment fail from general use; it needs to be able maintain power to the millions of customers it services.

As set forth in the Victim Impact Statement (Gov. Ex. A), the Defendant's actions had enormous operational impact on Idaho Power employees, to include responding in the middle of the night and working long hours over multiple days and weekends to restore power.  Not to mention the emotional impact on employees  -- not knowing whether this was an isolated incident

---

[2]https://www.idahopower.com/energy-environment/energy/energy-sources/hydroelectric/relicensing/relicensing-hcc/ (last visiting May 29, 2024).

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 6**

or more attacks were forthcoming.  Employees at the dams on the night of the attacks were forced to shelter-in-place out of fear for their safety.  The actions of the Defendant risked lives, caused fear and panic and cost hundreds of thousands in damages.  (*See* Gov. Ex. B).

### 3.  Defendant's Attacks were Premeditated

Defendant's attacks on the hydroelectric power stations were premediated.  On June 9, 2023, Meridian Police Department executed a search warrant at Defendant's residence.  Law enforcement located a rifle magazine with 9 rounds of live .303 ammunition, 56 rounds of live .303 ammunition as well 160 rounds of live .223 ammunition.  This caliber of ammunition was also found on the Defendant when he was arrested, as well as rifles using that same caliber of ammunition.  Further, a search of Defendant's computer revealed that the Defendant began researching the attack on the Kakhovka Hydroelectric Power Plant in Ukraine on June 6, 2023, including videos on BitChute showing the dam being destroyed and the devastating aftermath to infrastructure and civilians in Ukraine.[3]  Defendant not only watched multiple videos, but he also accessed articles, podcasts, as well as an Internet forum that discussed the attack.   Defendant did this on June 6, 7, and 8, just prior to his attack at Hells Canyon and Brownlee Dams.

Defendant also purchased materials to conduct his attacks in the days leading up to June 8 and 9, 2023.  Specifically, on June 5, 2023, Defendant purchased bolt cutters.  The next day on June 6, Defendant purchased two 5-gallon portable air tanks that were modified by the Defendant and filled with gasoline.

---

[3] Open-source research reveals that BitChute is a video hosting service known for hosting far-right individuals, conspiracy theorists and hate speech.

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 7**



The bolt cutters and gas cannisters were strapped to Defendant's motorcycle when he was arrested. Evidence collected by Washington County Sheriff's office after Defendant's arrest revealed Defendant was also found in possession of lighters and binoculars.  On June 6 and June 8, Defendant also took two guitars to a local pawn shop -- presumably one of these guitars was originally housed in the guitar case that was strapped to Defendant's back and used to conceal the firearms on the night of the attacks.

Defendant not only conducted research and purchased materials in preparation -- but also scouted the Hells Canyon dam prior to conducting the attack.  On June 8, Defendant drove his motorcycle for over three hours from his home in Meridian, Idaho to Hells Canyon Dam. Surveillance videos from Hells Canyon Dam show the Defendant driving over the Dam at approximately 9:44 pm on June 8 -- seemingly planning his attack -- because he returned to the Dam at approximately 10:54 pm and committed the crime.  Defendant returned at night so as to

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 8**

minimize the risk of being detected by law enforcement.  Defendant even picked up shell casings from the scene prior to leaving and driving to the Brownlee Dam, as they were found in his possession upon arrest.  This wasn't a spur of the moment decision by the Defendant, it was a planned and researched attack.

**B.** **The History and Characteristics of the Defendant**

Defendant's attack on the Hells Canyon Dam and the Brownlee Dam hydroelectric power stations were caused by Defendant's radical belief system and anti-government ideology, and not because of his recent diagnosis of bipolar disorder.  Defendant's words and actions reveal a man with deep seated anger against the federal government, disdain for law enforcement and willingness to engage in violence for his misguided beliefs.

**1.** **Defendant Bragged to Family Members After the Attack**

Defendant's statements and admissions to family members in post-arrest jail calls provide rare insight into Defendant's character and reasons for committing the attacks.  On June 17, 2023, over a week after the attacks, he tells his daughter that he is **"pissed off at the Government"** and states:

# "I DID WHAT I DID FOR A REASON."

During many of these jail calls, Defendant expresses his disdain for the Government, contending the Government is illegitimate and his actions were all a "protest."

- June 11, 2023 –  Defendant discusses with his wife about hiring an attorney and he tells her **"I don't recognize their authority"** when referring to the lack of authority of law enforcement.

- June 16, 2023 – Defendant expresses his anger toward law enforcement to his wife and tells her that **"the Government is illegitimate."**

- June 16, 2023 – Defendant tells his wife that **"the Government is illegitimate"** and **"I'm at the end of my life and I'm going to stand up."**

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 9**

- June 20, 2023 – Defendant tells his wife he may need a change of venue because he was a **"total douche to this Judge the first time."** He tells her that he isn't cooperating, and he isn't happy with the judges, sheriffs, and the Governor.  He states, **"I don't recognize their authority, I think their fucking all crooks."**

- June 21, 2023 – Defendant tells his wife he isn't complying and the "**Government is out of authority." "This is all a protest." "I want to make a statement."**

- June 28, 2023 – Defendant tells his wife why the State contends he lacks the fitness to proceed – it is because **"I won't recognize their authority."**

- July 2, 2023 – Defendant talking with his wife remarks, **"I don't believe in the Government right now." "I don't think they have authority."**

- July 2, 2023 – Defendant tells his wife that **"the country is fucked up and we need a revolution or a civil war."**  He goes on to state that he is **"at war."**

- July 4, 2023 – Defendant talks with his wife about his case proceeding in federal system and states that the **"Federal Government can cheat." "That's all the Federal Government does is cheat."**

- July 6, 2023 – Defendant tells his wife, **"I won't cooperate with the Government." "I don't believe in their authority."**  He claims to his wife that he is a **"political prisoner."**

These calls demonstrate the Defendant's deep-seated animosity for the federal government and provide Defendant's motive for the attack on the power substations the night of June 8 and early morning hours of June 9.

### 2.  Defendant Attempted to Elude Police After the Attacks

After planning the attacks, purchasing materials, and conducting the attacks under the cover of night, Defendant led police officers on a high-speed chase through a small town in Idaho.  After a Washington County Sheriff's Deputy observed Defendant on his motorcycle traveling toward Cambridge, Idaho, he followed the Defendant.  The Defendant was traveling through the town of Cambridge at speeds of approximately 80 miles of hour.  After emergency lights and sirens were initiated – did the Defendant stop?  No, Defendant increased his speed.  At one point,

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 10**

officers determined that the Defendant increased his speed to over 105 miles per hour and was still pulling away from law enforcement.  After approximately three miles, the Defendant, realizing that escape was unlikely, yielded to lights and sirens.  The deputies were forced to draw their weapons and Defendant was taken into custody.  Every decision the Defendant made was calculated -- he just didn't plan on being caught.

### 3.   Defendant Attacked Dams Based on Radical Belief Structure

Defendant's attack on the Hells Canyon Dam and the Brownlee Dam hydroelectric power stations was caused by Defendant's radical belief system and anti-government ideology, and not because of his recent diagnosis of bipolar disorder.  Defendant was admitted to Intermountain Hospital in mid-July 2023 for the purpose of restoring his competency after he was found not fit to proceed and lacked the capacity to make informed decisions about his treatment in the state case.  The State of Idaho had no choice but to order Defendant for a competency evaluation -- because Defendant refused to cooperate with law enforcement, the justice system, as well as health care professionals while in custody.

#### a.   Defendant's Diagnosis of Bipolar I Disorder, with Psychotic Features Was Not Cause of Attacks

A licensed psychologist working with Intermountain Hospital was tasked with addressing Defendant's competency.  The psychologist ultimately concluded that Defendant was competent and diagnosed him with Bipolar I Disorder, with psychotic features.  Bipolar 1 Disorder is one of the most common types of bipolar disorder that results in an individual experiencing symptoms of manic and depressive episodes as set forth below:

> Symptoms of a manic episode with bipolar 1 disorder may include:
> Feeling powerful
> Needing less sleep than usual
> Feeling restless
> Talking quickly

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 11**

Having many thoughts at once
Wanting to eat and drink more than usual.

Symptoms of a depressive episode can include:
Anxiety
Sadness
Restlessness
Difficulty Sleeping
Memory Problems
Trouble Make Decisions
Loss of Interest in Activities

Bipolar 1 with psychotic features includes the added symptoms, (1) phobias, (2) paranoid thoughts, (3) delusions, and (4) hallucinations, both visual and auditory.[4]  The psychologist ultimately recommended psychotropic medications for the Defendant, specifically mood stabilizers and medication that may decrease hallucinations. The psychologist reported that after 60 days, the Defendant was "reportedly doing well."

While Defendant was treated at Intermountain Hospital to assist with the symptoms he claims to experience, there was no conclusion in the psychological evaluation that Defendant's diagnosis was the cause of his attacks on the power grids.  Why?  - because the psychologist was not tasked with opining on Defendant's mental health as it related to the crimes he had committed. The goal was merely to restore the Defendant to competency, *ie.,* understanding the proceedings against him and assisting in his own defense.  Moreover, more than 4 percent of the adult population in the United States experiences bipolar disorder at some time in their lives[5] -- and as listed above, committing acts of violence such as that committed by the Defendant isn't a listed symptom.

---

[4] https://www.healthgrades.com/right-care/bipolar-disorder/bipolar-1-with-psychotic-features (last visited May 29, 2024).

[5]  https://www.nimh.nih.gov/health/statistics/bipolar-disorder (last visited May 29, 2024).

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 12**

### b.   Defendant's Refusal to Cooperate Led to Stay at Intermountain Hospital

Defendant refused to cooperate with law enforcement, the justice system, as well as health care professionals while in custody, so the State of Idaho had no choice but to order the Defendant for a competency evaluation.  All the while, Defendant knew exactly what he was doing and was telling his wife and daughter during jail calls that he was competent, his head was clear – it's just that he wasn't complying because he didn't want to get convicted.

Specifically, on June 16, only eight days after his arrest, Defendant and his wife calmly discussed his mental health evaluation during a jail call:

> **Defendant:** But I'm going to have a psychiatric evaluation.
> **Wife:** Before you can go any further?
> **Defendant:** Yeah.  They stopped – see, they have to get me in trial in so many days or everything gets screwed up or, like, they're in violation.  **And I wouldn't sign anything**. So they are going to go past that. So they're playing games.

Then on June 18, 2023, in a jail call with his wife he appeared very lucid when discussing the criminal justice system and why he was being sent for a mental health evaluation:

> **Defendant:** If they can commit me and put me away as crazy, then, you know, they get out of everything.  … They have to arraign me within fourteen days and come up with whatever – and whatever.  And I've been a douche, where they can't do it.  So they're -- so they don't want me in violation.  So they're going, you know, the "Is he crazy?" route, which, you know, usually they wouldn't do because that's – that's something you do after, for appeals.  You know?  Usually they convict you, and then you have to appeal it.  **But I'm fucking with them so much**…."

Later that same day, in a jail call with his wife:

> **Defendant:** [T]hey're supposed to send me up to Orofino to do a psychiatric evaluation, which is stupid.  . . .  **My head is probably clearer than it's been in thirty-five years.**

On June 21, in a jail call with his wife about whether he passed a competency exam:

> **Defendant:**  I just think I passed it.  You know?  Shit.  **I'm competent**.

On June 24, in a jail call to his wife:

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 13**

**Defendant: There's nothing wrong with me mentally**.

Two days later, on June 25, in a jail call with his daughter and his wife the Defendant told them

his head was clear:

> **Defendant: My head is clearer than its ever been, like, since** –
> . . .
> **Defendant: A long time**.

On June 30 he again spoke with his wife and told her on a jail call that he was not crazy and that

he met with health and welfare:

> **Defendant: And I don't think I'm crazy at all.  I'm just informed**.
> . . .
> **Defendant: I can't give her my political belief.  I'm not going to.**

On July 4 Defendant discussed his mental health with his wife in a jail call:

> **Defendant: I don't have any mental health issues.**  The only time I did was – if my diet
> gets out, it can --  I think it can screw with my head, but I'm not having any problems.
> . . .
> **Defendant:  Yeah.  I don't have psychosis.**
> . . .
> **Defendant:  I am not psychotic.  I know reality.**  You know?  And I know the country is
> fucked up –majorly – and its fucked up my life.

Later that same day, the Defendant again spoke with his wife:

> **Wife:**  Has anyone come in to talk to you anymore?
> **Defendant:**  No.  It's weird.  I'm just sitting here, like, in limbo.
> . . .
> **Defendant:  But I'm not cooperating so, you know, if I was cooperating, they'd be
> talking to me.**

Lastly, on July 11, Defendant explained to his wife why he wasn't cooperating with the courts:

> **Defendant:** Courts are all about agreements…. if you don't participate in it, then … on the
> Constitution ... puts them in limbo….
> . . .
> **Defendant:  I don't want them to convict me.**

In all these jail calls, the Defendant made it clear to his close family members that he wasn't in psychosis, wasn't hearing voices and is competent – clearer than he had been in 35 years – it's just that he didn't want to comply with the Government.   Defendant's true character was on full display during his jail calls with family members.

<strong>c.   Defendant's Anti-Government Ideology Drove Him to Commit Attacks</strong>

By June 11, Defendant can be heard in jail calls to his wife and daughter repeatedly stating that the "Government is illegitimate," as well as statements that this is "all a protest," and "I'm going to stand up," and "I'm at war."  This is all while admitting, "I did what I did for a reason." And what is that reason? -- an anti-government ideology developed after watching and reading far-right propaganda that discusses government conspiracy theories.   While most people don't subscribe to Defendant's ideologies or conspiracy theories, many do, including individuals that attacked the U.S. Capitol on January 6, 2021.

From at least June 5 through July 13, the last jail call before he went to Intermountain Hospital – he maintains the same belief structure that drove him to commit the attack and tells his wife on that date that "my opinion isn't changing."   Moreover, Defendant remains a "self-confessed conspiracy researcher" even after he began taking medication and receiving treatment, as set forth in the psychological evaluation on September 6, 2023.   Defendant believes what he believes (medicated or not) and is willing to resort to violence for those beliefs as he did on June 8 and 9, 2023.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence and Protect the Public.**

The Government seeks to underscore the seriousness of the attacks committed at the Hells Canyon and Brownlee Dams by the Defendant.   These dams provide essential electricity

production and serve customers not only in Idaho and Oregon, but other surrounding states as well. The facilities attacked by the Defendant represent the largest generators of electricity in Idaho Power's service territory. These dams are critical infrastructure, which is vital to ensuring the American people have access to water, electricity, and food. These facilities allow Idahoans to maintain normalcy in daily life. They power our schools, courthouses, hospitals, transportation systems, internet, and mobile networks. Any threat to these vital functions can be crippling to the economy and risk lives.

An online article from *Time*, written in January 2023, states that attacks on U.S. power stations reached a decade-long high with more than 100 incidents reported in 2022.[6] Attacks and potential attacks on substations and power plants are on the rise. Power plants in Florida, North Carolina, Oregon, South Carolina, Washington and even Idaho have been the subject of targeting by individuals with varying motivations. As the article discusses, the rise in incidents suggests that individuals are drawing inspiration from other attacks and copycat attacks are a growing concern. Providing just punishment in these types of cases is not only critical to hold individuals accountable, but also to deter future attacks, thereby protecting the public from grave harm.

Here, the Defendant sought to cripple the power supplied to millions of individuals in Idaho and surrounding States because he was "pissed off at the Government" and wanted to stand "in protest" and "make a statement." Defendant's conduct must not go unpunished. Any sentence below a USSG range sends the wrong message to this Defendant as well as other individuals that threaten our critical infrastructure. Defendant must be held accountable for his actions and individuals with similar radical belief structures must be deterred from planning and conducting attacks that threaten our way of life.

---

[6] https://time.com/6244977/us-power-grid-attacks-extremism/ (last viewed May 29, 2024).

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 16**

**D.**     **The Need to Provide Restitution to the Victim**

Under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, restitution must be awarded to victims in the amount of loss directly and proximately caused by the criminal conduct. Pursuant to the MVRA, defendants are required to make full restitution for offenses in which an identifiable victim has suffered a pecuniary loss. *Id.* § 3663A(c)(1)(B). The burden of proof is on the government to demonstrate by a preponderance of the evidence the amount of loss sustained by a victim. *Id.* § 3664(a), (e). Generally, district courts are afforded "'wide discretion' in fashioning restitution orders." *See United States v. Grovo*, 826 F.3d 1207, 1221 (9th Cir. 2016).

Here, Idaho Power Company, the victim, suffered $680,884.96 in loss as a direct result of Defendant's attacks with firearms on the hydroelectric power stations at the two dams. (*See* Gov. Ex. B). The Defendant agreed in the plea agreement to remit *at least* $546,982.46 in restitution to the victim. At this time, the Government is also seeking an additional $133,902.50 in restitution for post-incident security costs incurred by Idaho Power Company. These costs were the direct result of Defendant's actions. Idaho Power Company hired extra security services to protect its employees and infrastructure. At the time, the victim was unsure if the Defendant acted alone, or whether a "copy-cat" attack might occur based on the press coverage of the incidents. For these reasons, the Government requests that the victim be made whole and that the Defendant be required to remit $680,884.96 to Idaho Power Company.

## **CONCLUSION**

Application of 18 U.S.C. § 3553 supports a sentence of 33 months for the Defendant's commission of the crime of Destruction of an Energy Facility.  The Government submits that a sentence of 33 months is sufficient, but not greater than necessary, to accomplish the goals of sentencing, and that a lesser sentence is not supported by application of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted this 29th day of May, 2024.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

*/s/ Heather S. Patricco*

HEATHER S. PATRICCO
Assistant United States Attorney

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 18**